**NONPRECEDENTIAL DISPOSITION**

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted December 19, 2019[*]
Decided January 15, 2020

**Before**

JOEL M. FLAUM, *Circuit Judge*

MICHAEL Y. SCUDDER, *Circuit Judge*

AMY J. ST. EVE, *Circuit Judge*

No. 19-1343

| | |
|---|---|
| KATHRYN J. GILLETTE and RAIF SZCZEPANSKI, *Petitioners-Appellants*, | Appeal from the United States Tax Court. |
| *v.* | No. 16626-15 L |
| COMMISSIONER OF INTERNAL REVENUE, *Respondent-Appellee*. | Ronald L. Buch, *Judge*. |

### O R D E R

Kathryn Gillette and Raif Szczepanski appeal the tax court's decision upholding a levy to collect their unpaid income taxes from 2012. Because the tax court correctly upheld the petitioners' tax liability and acceptably concluded that the IRS acted within its discretion when it rejected their offer-in-compromise, we affirm.

---

[*] We granted the appellants' unopposed motion to waive oral argument. Thus, the appeal is submitted on the briefs and record. *See* FED. R. APP. P. 34(f).

# I

### A.      Background Facts

The petitioners' tax troubles stem from Gillette's compulsive gambling, which, the petitioners say (with some evidence), was linked to a prescription medication for restless leg syndrome. Gillette first began taking Mirapex, or its generic version, in the early 2000s. Over the years, her doctor periodically increased her dosage as the medication became less effective. After a large dosage increase in 2010, Gillette began to exhibit compulsive behavior, especially gambling. By 2012, her gambling was out of control: she often stayed at casinos for days, stopped associating with family and friends, and neglected her hygiene. To fuel her gambling, Gillette eventually made an early withdrawal of $104,001 from her individual retirement account (IRA), less than two years before she could do so without penalty.

Gillette's gambling also threatened a rental property business she had built up over several decades. While continuing to collect rents from the 29 properties she owned, Gillette stopped paying the mortgages, property taxes, and maintenance expenses, instead spending the income at casinos. As a result, by 2013, several of her rental properties were in foreclosure or scheduled for tax sales.

In 2013, Gillette first learned that Mirapex had been linked to the onset of impulse-control disorders in some patients. She responded by weaning herself off the medicine, but did not stop taking it completely until the second half of 2015.

### B.      Petitioners' 2012 Tax Return and IRS Review

As a married couple, the petitioners filed a joint 2012 tax return and reported, as relevant here, gambling winnings of $1,317,348, gambling losses of $1,315,227, and $126,465 net profit from Gillette's rental properties. The couple's reported tax liability was $85,231, which included a 10% tax of $10,400 for Gillette's early IRA withdrawal, *see* 26 U.S.C. § 72(t)(1), and $17,851 of alternative minimum tax (AMT), *see id.* § 55. Withholdings reduced their net tax liability to $75,954, which they did not pay. Consequently, in 2014, the IRS sent the petitioners a notice of intent to levy certain property to satisfy the tax debt. The petitioners requested a collection due process (CDP) hearing before a settlement officer in the IRS's Office of Appeals.

During the CDP process, the petitioners submitted an offer-in-compromise, proposing to pay $38,968 to resolve their back taxes for 2012. They checked a box on the

offer form identifying the reason for their offer as "Exceptional Circumstances (Effective Tax Administration)." By checking that box, the petitioners acknowledged they owed the full amount of taxes and had sufficient assets to pay in full, but asserted that due to "exceptional circumstances, requiring full payment would cause an economic hardship or would be unfair and unequitable." Specifically, the petitioners cited Gillette's gambling and their related financial troubles. For support, they submitted medical records, documents explaining the side effects of Gillette's medication, and an income analysis listing their 26 rental properties (including 11 with no mortgage balance).

The offer examiner who reviewed the proposed compromise calculated the petitioners' net equity to be $813,484—more than enough to pay the full amount due. The examiner discussed this finding with the petitioners and suggested that they could satisfy their tax liability by selling two rental properties. Gillette disagreed, insisting she needed income from those properties for retirement. A settlement officer concluded, based on the examiner's findings, that the petitioners had sufficient equity in real estate to pay their full liability and that their circumstances did not otherwise warrant a compromise.

### C.        Initial Petition in Tax Court and Remand to Office of Appeals

Gillette and Szczepanski then sought review of the settlement officer's decision in tax court. Before trial, the court granted the Commissioner's unopposed motion to remand to the Office of Appeals because, although the settlement officer had addressed economic hardship, he did not sufficiently address whether Gillette's gambling problem justified relief on public policy grounds.

On remand, the settlement officer held a supplemental CDP hearing. The petitioners provided additional medical records, financial information, and tax sale notices, plus medical research and court documents from proceedings against drug companies and casinos. The documents included the petitioners' 2015 tax return, which reported gambling income. Gillette also supplied further evidence of her compulsive behavior, arguing that she had no control over her gambling and as a result should not be responsible for the AMT or the 10% additional tax on the IRA.

The settlement officer again rejected the petitioners' offer-in-compromise and sustained the proposed levy. In the supplemental notice of determination, the officer considered public policy and equity grounds for a compromise and concluded that the petitioners' arguments lacked support in the Internal Revenue Manual. The officer observed that the side effects of Gillette's medicine were listed on the label six years

before her increase in dosage. By continuing to gamble after 2013 and failing to follow advice on treating her compulsive gambling, Gillette did not act reasonably or responsibly. The officer further observed that a taxpayer's belief that a law is unfair does not support the acceptance of an offer-in-compromise based on public policy.

### D.    Tax Court Trial and Decision

Gillette and Szczepanski again petitioned the tax court for review. Before trial, the Commissioner filed motions in limine seeking to exclude the petitioners' witnesses: a social worker, the settlement officer, the Commissioner's legal counsel, and Gillette's doctor, accountant, ex-husband, sister, and son. The Commissioner argued that a tax court's review is limited to the administrative record and, regardless, the proffered testimony would be cumulative. The tax court granted the motions in part, disallowing testimony from the social worker, the IRS lawyer, and Gillette's doctor, accountant, and ex-husband. At trial, the court heard from the petitioners, settlement officer, and Gillette's sister and son.

The petitioners argued that the evidence demonstrated that they qualified for an exception to the 10% penalty for early IRA withdrawals because Gillette's compulsive gambling counts as a "disability" as defined in 26 U.S.C. § 72(m)(7). *See id.* § 72(t)(2)(A)(iii) (stating early withdrawal penalty does not apply if attributable to a disability as defined in § 72(m)(7)). They further contended that the AMT was neither fair nor just because Gillette's gambling caused an irregularity in their 2012 return. So, too, did the petitioners argue that the settlement officer rejected their offer-in-compromise based on "prejudice rather than facts."

Reviewing the petitioners' challenges to their tax liability *de novo*, the tax court concluded that Gillette was not disabled under the Tax Code because, even assuming she suffered from a qualifying impairment, it was remediable. With respect to the AMT, the tax court concluded that the petitioners identified no authority permitting an equitable exemption.

Next, the tax court reviewed the settlement officer's rejection of the petitioners' offer-in-compromise for abuse of discretion. The court concluded that the petitioners had not argued for a compromise based on economic hardship and did not qualify regardless. As to public policy or equity grounds, the court concluded that while Gillette's circumstances were unfortunate the settlement officer committed no abuse of discretion in rejecting the proposed settlement. Specifically, the petitioners did not

satisfy any of the regulatory bases and likewise failed to show that their compromise would not create disincentives to obey tax laws. *See* 26 C.F.R. § 301.7122-1(b)(3), (c)(3).

## II

When reviewing a tax court ruling on liability, 26 U.S.C. § 7482(a)(1), we assess questions of law *de novo* and factual determinations, including applications of law to the facts, for clear error. *Kikalos v. Comm'r*, 434 F.3d 977, 981–82 (7th Cir. 2006).

### A.      Assessment of 10% Penalty for Early IRA Withdrawal

Gillette and Szczepanski first argue that the tax court erred in upholding the 10% penalty for Gillette's early IRA withdrawal. *See* 26 U.S.C. § 72(t)(1). Certain statutory exceptions to this penalty exist, but they are narrow. *See id.* § 72(t)(2); *Rousey v. Jacoway*, 544 U.S. 320, 332 (2005). The petitioners argue that they qualify because Gillette's compulsive gambling amounted to a disability. *See* 26 U.S.C. § 72(t)(2)(A)(iii). Under 26 U.S.C. § 72(m)(7), a person is "disabled" if she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration."

Here, even if Gillette suffered from a condition that would otherwise satisfy that definition, the tax court permissibly concluded that she did not qualify for the exception because her impairment was "remediable." *See* 26 C.F.R. § 1.72-17A(f)(4). An impairment is remediable if, "with reasonable effort and safety" it can be "diminished to the extent that the individual will not be prevented by the impairment from engaging in his customary or any comparable substantial gainful activity." *Id.* The record suggests that Gillette's condition did not prevent her from engaging in her "customary or any comparable substantial gainful activity" in 2012. *Id.* § 1.72-17A(f)(2). She continued to operate her rental property business and the petitioners still reported $126,465 in profit from the business on their tax return. Even assuming Gillette was temporarily unable to operate her rental business, she received treatment for compulsive gambling in a reasonable and safe manner with the help of her family and doctors without interrupting her rental property business. On this record evidence, we see no error in the tax court's conclusion that Gillette was not disabled by compulsive gambling in 2012.

The petitioners insist that the Tax Code's definition of disability is outdated and inconsistent with disability discrimination laws. This argument is for Congress,

however, not the courts. *See Kim v. Comm'r*, 679 F.3d 623, 626 (7th Cir. 2012) (explaining that the judiciary "is not authorized to redraw the boundaries" set by Congress).

### B.      Alternative Minimum Tax Assessment

The petitioners further argue that they should not be liable for the AMT because it was only Gillette's gambling income and failure to pay property taxes or mortgages due to her gambling that subjected them to the tax. They do not offer a recognized legal basis for an exception to the AMT, though; their argument amounts to an appeal to fairness. But the AMT has no equitable exceptions, *see* 26 U.S.C. § 55, and "it is not a feasible judicial undertaking to achieve global equity in taxation," *Kenseth v. Comm'r*, 259 F.3d 881, 885 (7th Cir. 2001).

### C.      Tax Court's Nonliability Determinations

Next, the petitioners challenge the settlement officer's rejection of their offer-in-compromise. They contend that both economic hardship and public policy interests compelled acceptance of their proposal. We review for abuse of discretion a tax court's rulings on nonliability issues in a CDP case. *Gyorgy v. Comm'r*, 779 F.3d 466, 472–73 (7th Cir. 2015). Our review is "highly deferential" because, "[t]he decision to entertain, accept or reject an offer in compromise is squarely within the discretion of the appeals officer and the IRS in general." *Kindred v. Comm'r*, 454 F.3d 688, 694, 696 (7th Cir. 2006).

A settlement based on economic hardship requires a showing that collection of the full tax liability would prevent the taxpayer from paying reasonable basic living expenses. *See* 26 C.F.R. §§ 301.6343-1(b)(4)(i), 301.7122-1(b)(3)(i), (c)(3)(i). The petitioners assert that selling two of their properties would create an economic hardship and would prevent them from paying basic living expenses. But the record does not support that assertion. Instead, it shows that Gillette did not want to sell two rental properties because she planned to use the rental income for her retirement. The petitioners also assert that they had a negative monthly income, which the settlement examiner overlooked because of an error on their asset worksheet that appears to list their net monthly business income as $8,904 rather than $3,904. Even so, the details of the petitioners' monthly income and expenses did not form the basis of the settlement officer's decision to reject the proposed compromise. It was their $813,484 net equity in real estate. We see no abuse of discretion in that determination.

Nor do we see any abuse of discretion in the tax court's rejecting the petitioners' public policy and equitable justifications for reducing their tax liability. Settlement on

these grounds is justified only if, based on exceptional circumstances, "collection of the full liability would undermine public confidence that the tax laws are being administered in a fair and equitable manner." 26 C.F.R. § 301.7122-1(b)(3)(ii); *see also id.* § 301.7122-1(c)(3)(iv) (providing examples where the IRS might agree to settle based on public policy or equity considerations). We cannot say it was unreasonable for the tax court to determine that Gillette's situation was not so extraordinary that it required compromise, especially when she was able to file her tax returns accurately and continue to collect rents from her properties.

The petitioners likewise do not offer a reasoned basis to challenge the settlement officer's determination that acceptance of their offer—less than half of their total liability, despite their substantial assets—would undermine taxpayer compliance with the tax laws. *See* 26 C.F.R. § 301.7122-1(b)(3)(iii). The petitioners also contend that the settlement officer discriminated against Gillette and her compulsive gambling by stating that she did not "act reasonably or responsibly." While perhaps worded sharply, that conclusion finds support in the record as a factual matter given Gillette's spotty treatment history.

The petitioners also challenge the tax court's exclusion of testimony from Gillette's doctors and social worker. These witnesses, they claim, could have testified about the nature of her illness, her diagnosis and treatment, and her and her doctors' lack of awareness of the effects of her medications. But we see no abuse of discretion in their exclusion. *See Musa v. Comm'r*, 854 F.3d 934, 940 (7th Cir. 2017). Gillette's medical records and other documents submitted by stipulation provided similar information, and neither the tax court nor the settlement officer expressed doubt that Gillette suffered from compulsive gambling.

Finally, the Commissioner asks us to weigh in on whether the tax court's review of nonliability issues (for example, the IRS's rejection of the offer-in-compromise) should have been limited to the administrative record from the CDP hearings. *Compare Robinette v. Comm'r*, 439 F.3d 455, 459–61 (8th Cir. 2006) (determining that tax court review of nonliability issues in CDP cases is limited to the administrative record), *with Gyorgy*, 779 F.3d at 473 n.5 (declining to decide the issue). This case does not require us to decide the question. Our analysis shows that the Commissioner prevails on appeal even if the tax court did consider evidence outside the administrative record on the nonliability issues. The outcome here, in short, does not turn on how we would resolve the question.

We have considered petitioners' remaining arguments and determined that they lack merit.

AFFIRMED